## UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF PENNSYLVANIA

DIANE VELIKAS,          :
                              :

          Plaintiff        :     No. 3:16-CV-0233
                              :

          vs.             :     (Judge Nealon)
                              :

NANCY A. BERRYHILL,[1] Acting  :
Commissioner of Social Security, :
                              :

          Defendant     :

## MEMORANDUM

On February 10, 2016, Plaintiff, Diane Velikas, filed this instant appeal[2] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration, ("SSA"), denying her application for Disability Insurance Benefits, ("DIB"), under Title II of the Social Security Act, 42 U.S.C. § 1461, et seq. (Doc. 1). The parties have fully briefed the appeal. For the reasons

---

1. Nancy A. Berryhill became the new Acting Commissioner of Social Security on January 23, 2017. See http://blog.ssa.gov/meet-our-new-acting-commissioner/. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill should be substituted for former Acting Commissioner, Carolyn W. Colvin, as the defendant in this suit. No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

2. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

set forth below, the decision of the Commissioner denying Plaintiff's application for DIB will be vacated.

## BACKGROUND

Plaintiff protectively filed[3] her application for DIB on December 10, 2010, alleging disability beginning on October 24, 2009, due to a combination of "complications from neck surgery, neck pain, and herniated discs." (Tr. 246, 249).[4] After this claim was initially denied by the Bureau of Disability Determination, ("BDD"),[5] a hearing was requested by Plaintiff, which was held on April 2, 2012, before administrative law judge Michelle Wolfe, ("ALJ"), at which Plaintiff and impartial vocational expert, Mr. Keating, testified. (Tr. 80). On June 19, 2012, the ALJ granted Plaintiff's disability application for the period of March 12, 2010 through December 22, 2011. (Tr. 140). On October 17, 2013, the matter was remanded by the Appeals Council with the instruction for the ALJ to consider

---

3. Protective filing is a term for the first time an individual contacts the Social Security Administration to file a claim for benefits. A protective filing date allows an individual to have an earlier application date than the date the application is actually signed.

4. References to "(Tr. _)" are to pages of the administrative record filed by Defendant as part of the Answer on April 13, 2016. (Doc. 5).

5. The Bureau of Disability Determination is an agency of the state which initially evaluates applications for disability insurance benefits on behalf of the Social Security Administration.

additional evidence submitted for the period after December 22, 2011. (Tr. 150-152). On April 9, 2014, a remand hearing was before the ALJ, at which Plaintiff and impartial vocational expert Michelle Giorgio, ("VE"), testified. (Tr. 58). On April 25, 2014, the ALJ issued a second decision denying Plaintiff's application for DIB for the time period of December 22, 2011 through the date of the ALJ's decision. (Tr. 19-34). On December 17, 2015, the Appeals Council denied Plaintiff's appeal, thus making the decision of the ALJ final. (Tr. 2-7).

Plaintiff filed the instant complaint on February 10, 2016. (Doc. 1). On April 13, 2016, Defendant filed an answer and transcript from the SSA proceedings. (Docs. 4 and 5). Plaintiff filed a brief in support of her complaint on June 14, 2016. (Doc. 8). Defendant filed a brief in opposition on July 14, 2016. (Doc. 9). Plaintiff did not file a reply brief.

Plaintiff was born in the United States on September 27, 1959, and at all times relevant to this matter was considered an "individual closely approaching advanced age."[6] (Tr. 246). Plaintiff graduated from high school in 1977, and can communicate in English. (Tr. 248, 250). Her employment records indicate that

---

6. "Person closely approaching advanced age. If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work." 20 C.F.R. § 404.1563(d).

she previously worked as a caterer, a customer service representative, and a realtor.  (Tr. 250).

In a document entitled "Function Report - Adult" filed with the SSA, Plaintiff indicated that she lived in a house with her husband.  (Tr. 282).  From the time she woke up to the time she went to bed, Plaintiff took her medications, tended to the dishwasher, sat in a recliner with a heating pad, and performed "menial" tasks such as taking the dog outside and checking the mail.  (Tr. 282). She had no problems with personal care tasks such as dressing and bathing, prepared meals such as sandwiches daily for thirty (30) minutes maximum, performed light dusting for thirty (30) minutes before needing to rest, and shopped in stores for groceries for "twice as long as [] normal . . . using the cart for support."  (Tr. 283-285).  She was able to walk for up to fifteen (15) minutes before needing to rest for thirty (30) minutes before resuming walking.  (Tr. 287). When asked to check items which her "illnesses, injuries, or conditions affect," Plaintiff did not check talking, hearing, seeing, memory, understanding, or following instructions.  (Tr. 287).

Regarding concentration and memory, Plaintiff did not need special reminders to take care of her personal needs, to go places, or to take her medicine. (Tr. 284, 286).  She could pay bills, use a checkbook, count change, and handle a

4

savings account, but noted that "[b]ills are paid late once or twice a month [due to] pain and depression [that] prevent [her] from being on time." (Tr. 285-286). She stated that "pain and medications" prevented her from paying attention, she could follow written and spoken instructions, she was not able to finish what she started, and she had worsened depression, anxiety, and blood pressure with changes in stress and routine. (Tr. 287-288).

Socially, Plaintiff rarely left her home because she would "get too depressed because of [her] restrictions." (Tr. 285). When she did leave the house, she noted she would have to "deprive [her]self of pain medication to go safely to the drug store or [do] menial errands." (Tr. 285). She noted she did not spend time with others because of depression. (Tr. 286). Her hobbies included reading for fifteen (15) minutes at a time and watching television, and she indicated that she could no longer engage in former hobbies of gardening or home decorating due to her illnesses, injuries, or conditions. (Tr. 286).

At her remand oral hearing on April 9, 2014, Plaintiff testified that, since her last hearing, she was diagnosed with Rheumatoid Arthritis, Polyarthritis, and Osteoid Osteoma. (Tr. 67). She stated that the arthritis caused severe neck pain and weakness and numbness in her hands. (Tr. 72). She indicated that her hand numbness would occur "right away almost" when using a computer keyboard.

(Tr. 73).  She was prescribed steroids for these condition, and indicated the steroids caused a tumor in her leg that caused leg cramps and an inability to walk quickly, made her have to stop walking after fifty (50) feet to rest or lean on something before resuming walking again, and caused a feeling like her leg was falling asleep while sitting.  (Tr. 67-68).  Plaintiff also indicated that, since her last hearing, she had been prescribed and was using a Fentanyl patch for pain that made her "extremely tired," effected her motor skills, and caused difficulty in concentrating.  (Tr. 64).  She stated that she still needed to have more surgery in her neck.  (Tr. 72).  She testified that, regarding household chores, she was only able to do light chores, and that an activity such as emptying the dishwasher could "sometimes trigger an onslaught of muscle spasms" that caused her to have to rest in a recliner with a heating pad and take a muscle relaxer, something she testified she had to do about ten (10) times a day for a half hour to an hour and a half.  (Tr. 65, 67, 70).  She indicated that she could no longer vacuum, scrub the windows, or crochet due to her impairments.  (Tr. 71, 73).  She testified that she performed very minimal work on the computer and did not read as much as she would like to because she could not concentrate, indicating that she would stop reading when she found herself concentrating more on ignoring the pain than what she was reading, which usually was about fifteen (15) minutes into reading.  (Tr. 65-66,

69).  She stated that her husband accompanied her to the grocery store.  (Tr. 66).

She also stated that her mental health impairments caused difficulty with focusing,

which made her not go to church like she wanted to.  (Tr. 74).

## MEDICAL RECORDS

### A.    Medical Evidence

#### 1.    Wyoming Valley Medical Center

On December 22, 2011, Plaintiff had an appointment with Alan R. Vannan,

PA-C, ("PA Vannan"), at Wyoming Valley Medical Center for a routine post-

operative visit.  (Tr. 474).  It was noted that Plaintiff was doing extremely well,

was happy with the outcome of the surgery, had sixty (60) to seventy (70) percent

improvement in her pre-operative symptoms, had no difficulty with swallowing,

breathing, or speaking, and had some right upper extremity pain at times, but with

much improvement.  (Tr. 474).  Her physical examination revealed: clear speech;

swallowing without difficulty; a non-tender back without spasms; 5/5 bilateral

upper and lower extremity strength; sensation intact to soft touch; a normal gait;

and independent ambulation.  (Tr. 474).  The medications she was taking at the

time of this appointment were listed as follows: Ativan; Methadone; Diazepam;

Gabapentin; Docusate Sodium; Magnesium Aspartate; Mucinex; Celexa; and

Metoprolol.  (Tr. 474).  Plaintiff was instructed by PA Vannan that she: could lift

up to ten (10) pounds and increase by ten (10) pounds a month as tolerated; should not bend, twist, run, jump, or do sit-ups or exercise; and could walk and use stairs as tolerated. (Tr. 475). She was scheduled for a follow-up in three (3) months. (Tr. 475).

On July 18, 2012, Plaintiff had a routine eight (8) month post-operative visit with Kara L. Sharp, PA-C, ("PA Sharp"). (Tr. 846). Plaintiff reported that: her right upper extremity pain had resolved, but that her posterior cervicalgia remained the same; her neck pain was intermittent, exacerbated with activity, and improved with ice and rest; the paresthesias of her bilateral hands and fingers remained the same as "pre-op:" she had diffuse muscular and joint pain in her trapezius area, shoulders, wrists, knees, and ankles; she had worsening chronic mid-back pain for a month that was becoming progressively worse; she had not seen a Rheumatologist due to financial concerns and stopped all medications due to cost; and she denied radicular pain, paresthesias, or weakness of her bilateral extremities. (Tr. 846). A physical examination revealed: tenderness to palpation of the cervical spine and paraspinal musculature; clear speech; swallowing without difficulty; 5/5 strength throughout the bilateral upper and lower extremities; a normal gait; and independent mobility. (Tr. 846). Plaintiff was assessed as having an acute exacerbation of chronic mid-back pain and diffuse muscular and joint

pain "highly suspicious of Fibromyalgia." (Tr. 847). Plaintiff was instructed by PA Sharp: to continue increasing activity and lift as tolerated; to not sit bolt upright for greater than forty (40) minutes for four (4) times a day; to not to run, jump, do sit-ups, or perform excessive exercise; and to continue to walk and use stairs as tolerated. (Tr. 847). Plaintiff was scheduled for a follow-up with Dr. Schlifka in three (3) months. (Tr. 847).

## 2.    **InterMountain Medical Group**

On December 27, 2011, February 16, 2012, February 22, 2012, March 8, 2012, July 25, 2012, and August 8, 2012, Plaintiff had an appointments with John Menio, M.D. due for a follow-up of her "active problems," which included Chronic Pain Syndrome, Depressive Disorder, cervical pain, and pre-diabetes. (Tr. 712, 716, 720, 727, 889, 894). Plaintiff's self-reported symptoms included edema, muscle and bone aches, insomnia, clavicle symptoms, muscle spasms, back pain, knee pain, bilateral foot pain, and diffuse pain localized to her joints. (Tr. 714, 720, 727, 729, 889, 894). Her physical examination revealed: a well nourished and developed appearance with no acute distress; tenderness with palpation and movement in her bilateral shoulders and knees and cervical spine in the trapezius area; normal motor strength, deep tendon reflexes, and sensation; paracervical spasm in her back; an impaired and anxious thought process;

9

decreased range of motion in the cervical spine; and no tenderness on palpation of the legs. (Tr. 714, 719, 723, 891, 898). Dr. Menio diagnosed Plaintiff with Hypertension, Hyperlipidemia, Chronic Pain Sydrome, Generalized Anxiety Disorder, Edema, and Polyarthritis of multiple sites, and referred Plaintiff to Rheumatology. (Tr. 714-715, 719, 723, 892, 898).

On May 9, 2012, Plaintiff had an appointment with Mary Jo Bishop, CRNP, of InterMountain Medical Group for evaluation and treatment of polyarthralgias. (Tr. 706). Plaintiff's self-reported symptoms included: pain and swelling in her lower legs; a constant burning in her shoulders; malaise; headaches twice a month; neck pain and stiffness; stiffness and pain in her joints, wrists, hands, and ankles; muscle aches and spasms in her shoulders; anxiety; sleep disturbances; depression; and dry skin. (Tr. 706). A physical examination revealed Plaintiff: was well nourished and developed and in no acute distress; had edema in her lower legs; had normal range of motion in all joints; had swelling and tenderness on palpation in her bilateral fingers; had tenderness on palpation in her bilateral wrists and shoulders; had decreased grip strength in her bilateral hands; had a normal appearance and no tenderness or spasms of all areas of her spine; had tenderness on palpation of her bilateral hips and knees; had a normal gait, stance, balance, reflexes, and sensation; had a pleasant mood; and had dry skin. (Tr. 708-709).

Plaintiff was assessed as having arthralgias in multiple sites and myalgia and myositis. (Tr. 709). It was noted that Dr. Blidner reviewed the data and examined Plaintiff and assisted in the formulation of the plan for Plaintiff. Plaintiff was given Prednisone for a week-long trial period, was scheduled for a follow-up in two (2) weeks, and was to undergo x-rays of her bilateral hands and wrists due to suspicion of inflammatory arthritic disease. (Tr. 710).

### 3. Arthritis Center

On July 23, 2012, and August 20, 2012, Plaintiff had appointments at the Arthritis Center for diffuse pain in her bilateral shoulders, knees, and feet. (Tr. 904-905). A physical examination revealed joint tenderness and moderate pain on range of the shoulders with mild limitation and no swelling in the knees or feet. (Tr. 904-905). Plaintiff was assessed as having Diffuse Polyarthritis, Chronic Pain Syndrome, and abnormality of the right femur, and was given a prescription for Prednisone. (Tr. 904-905). Imaging of her right femur was ordered.

### B. Medical Testing

### 1. X-rays of Bilateral Hands and Wrists

On May 9, 2012, Plaintiff underwent x-rays of her bilateral hands and wrists. (Tr. 786). The x-rays revealed changes in the right hand that are degenerative in nature with possible erosion at the second "MCP" and mild

degenerative changes at the carpal metacarpal joint in the left wrist and hand. (Tr. 786).

### 2.  X-rays of Cervical Spine

On July 18, 2012, Plaintiff underwent x-rays of her cervical spine due to left arm pain and spasms "radiating down," mid-back pain, and status post anterior cervical diskectomy and fusion. (Tr. 860). The x-rays revealed stable post-operative and degenerative changes at the C4-C5 level with minimal endplate osteophyte at the C3-C4 level. (Tr. 860).

### 3.  X-rays of Thoracolumbar Spine

On July 30, 2012, Plaintiff underwent x-rays of her thoracolumbar spine for back pain. (Tr. 861). The x-rays revealed moderate degenerative disease at L1-L2 and L5-S1 with mild degenerative disc disease at other levels. (Tr. 861).

### 4.  Whole Body Bone Scintigraphy

On July 30, 2012, Plaintiff underwent a whole body bone scintigraphy for generalized pain and polyarthritis. (Tr. 862). This scan revealed a nonspecific, subtle focus of increased tracer uptake in the mid-right femur. (Tr. 862).

### 5.  X-rays of Right Femur

On August 13, 2012, Plaintiff underwent x-rays of her right femur for pain in her joint. (Tr. 863). The x-rays revealed focal cortical thickening/ periosteal

bone formation of the femoral middiaphysis laterally with central lucency, which indicated possible diagnoses of stress changes, sequela of bisphosphonate use, chronic osteomyelitis, or osteoid osteoma, with the latter being less likely "given Plaintiff's age." (Tr. 863).

### 6. CT Scan of the Right Femur

On August 21, 2012, Plaintiff underwent a CT scan of her right femur for history of osteomyelitis. (Tr. 864). The impression was that Plaintiff had dense periosteal reaction in the lateral cortex of the mid femoral shaft consistent with a diagnosis of osteoid osteoma. (Tr. 864).

### C. Medical Opinions

### 1. John Menio, M.D.

On January 15, 2012, Dr. John Menio completed a "Physical Impairment Questionnaire" for Plaintiff. (Tr. 467-468). Dr. Menio noted Plaintiff's diagnoses included Chronic Pain Syndrome, Peripheral Edema, and Cervical and Lumbar Disc Disease. (Tr. 467). He noted that Plaintiff 's symptoms included chronic, constant pain and leg swelling, and that the medications she took for her diagnoses caused fatigue, drowsiness, and dizziness. (Tr. 467). He opined that Plaintiff's impairments were severe enough to constantly interfere with the attention and concentration require to perform simple, work-related tasks. (Tr. 467). He further

opined that Plaintiff: (1) would need to recline or lie down in excess of the typical fifteen (15) minute breaks in both the morning and afternoon and a thirty (30) to sixty (60) minute lunch during an eight (8) hour workday ; (2) could walk one (1) city block without rest or significant pain; (3) could sit for thirty (30) minutes at a time and up to three (3) hours in an eight (8) hour workday; (4) could stand and/ or walk for twenty (20) minutes at a time and up to one (1) hour in an eight (8) hour workday; (5) would need to be able to shift positions at will from sitting, standing, or walking; (6) would need unscheduled breaks hourly for twenty (20) minutes at a time during an eight (8) hour workday; (7) could occasionally lift less no more than (10) pounds; (8) could never lift anything over ten (10) pounds; (9) was limited in bilateral use of her hands, fingers, and arms to twenty percent (20%) of the time of an eight (8) hour workday; and (10) was not capable of working an eight (8) hour day, five (5) days a week on a sustained basis.  (Tr. 467-468).

## 2. **Anthony Galdieri, Ph.D.**

On January 26, 2011, Dr. Galdieri completed a "Psychiatric Review Technique" for Plaintiff's mental health impairments based on a review of her record.  (Tr. 110-111).  He opined that, for the "B" criteria of Impairment Listing 12.06, Anxiety Disorders, Plaintiff had: (1) mild restriction of activities of daily living; (2) mild difficulties in maintaining social functioning; (3) mild difficulties

in maintaining concentration, persistence, or pace; and (4) no repeated episodes of decompensation. (Tr. 111).

### 3. Paula K. Vanscoy, SDM

On February 10, 2011, Paula Vanscoy, Single Decision Maker, ("SDM"),[7] opined Plaintiff: (1) could occasionally lift and/ or carry up to twenty (20) pounds; (2) could frequently lift and/ or carry up to ten (10) pounds; (3) could sit, stand, and/ or walk for six (6) hours in an eight (8) hour workday; (4) could engage in limited pushing and pulling of the upper extremities within the aforementioned weight restrictions; and (5) was limited in reaching overhead on the left. (Tr. 112-113).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner. See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995). However, the court's review of the Commissioner's

---

7. An "SDM" is an abbreviation for "Single Decision Maker." http://nls.org/Disability/VocationalRehabilitation/BenefitsManagementManual2009Version/Chapter1. After an extensive review of the record and other cites, there is no evidence that Paula Vanscoy is a medical doctor, doctor of osteopathic medicine, or any other title in the medical profession.

findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence." Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld. 42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999). Substantial evidence has been described as more than a mere scintilla of evidence but less than a

preponderance. <u>Brown</u>, 845 F.2d at 1213. In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." <u>Consolo v. Federal Maritime Commission</u>, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," <u>Cotter</u>, 642 F.2d at 706, and "must take into account whatever in the record fairly detracts from its weight." <u>Universal Camera Corp. v. N.L.R.B.</u>, 340 U.S. 474, 488 (1971). A single piece of evidence is not substantial evidence if the Commissioner ignores countervailing evidence or fails to resolve a conflict created by the evidence. <u>Mason</u>, 994 F.2d at 1064. The Commissioner must indicate which evidence was accepted, which evidence was rejected, and the reasons for rejecting certain evidence. <u>Johnson</u>, 529 F.3d at 203; <u>Cotter</u>, 642 F.2d at 706-07. Therefore, a court reviewing the decision of the Commissioner must scrutinize the record as a whole. <u>Smith v. Califano</u>, 637 F.2d 968, 970 (3d Cir. 1981); <u>Dobrowolsky v. Califano</u>, 606 F.2d 403, 407 (3d Cir. 1979).

**SEQUENTIAL EVALUATION PROCESS**

To receive disability benefits, the plaintiff must demonstrate an "inability to

engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 432(d)(1)(A). Further,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits. See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92. This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to

return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  Id.  As part of step four, the Commissioner must determine the claimant's residual functional capacity.  Id.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one through four."  Residual functional capacity is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2, 1996).  A regular and continuing basis contemplates full-time employment and is defined as eight hours a day, five days per week or other similar schedule.  The residual functional capacity assessment must include a discussion of the individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).").

"At step five, the burden of proof shifts to the Social Security Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and residual functional capacity."

Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546, 550 (3d Cir. 2004).

## ALJ DECISION

Initially, the ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through the date last insured of December 31, 2014. (Tr. 25). At step one, the ALJ found that Plaintiff had not engaged in substantial gainful work activity from the period at issue on remand of December 22, 2011. (Tr. 25).

At step two, the ALJ determined that Plaintiff suffered from the severe[8] combination of impairments of the following: "obesity, chronic pain syndrome; cervical radiculopathy, status post anterior cervical discectomy and fusion (ACDF); and as of 07/11, cervical sponylosis with nerve root lesion, status post ACDF; as of 06/ 02/10, left shoulder arthritis; and as of 07/12, polyarthritis (20 C.F.R. 404.1520(c) and 416.920 (c))." (Tr. 25).

---

8. An impairment is "severe" if it significantly limits an individual's ability to perform basic work activities. 20 C.F.R. § 404.921. Basic work activities are the abilities and aptitudes necessary to do most jobs, such as walking, standing, sitting, lifting, pushing, seeing, hearing, speaking, and remembering. Id. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work. 20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and 96-4p.

At step three of the sequential evaluation process, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).  (Tr. 26-27).

At step four, the ALJ determined that Plaintiff had the RFC to perform sedentary work with limitations.  (Tr. 27-33).  Specifically, the ALJ stated the following:

> After careful consideration of the entire record, the undersigned finds that [Plaintiff] has the [RFC] to perform a range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).  She can occasionally balance, stoop, crouch, kneel, and climb, but never on ladders, ropes, or scaffolds, and never crawling.  She must avoid pushing and pulling with the upper extremities.  She can occasionally reach overhead.  She can occasionally push and pull with the lower extremities.  She must avoid concentrated exposure to vibrations and hazards, including moving machinery and unprotected heights.

(Tr. 27-28).  The ALJ concluded that Plaintiff was capable of performing past relevant work as an order clerk and travel agent because this work did not require performance of work-related activities precluded by her RFC.  (Tr. 33-34).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between December 22, 2011, the period at

issue on remand, and the date of the ALJ's decision.  (Tr. 34).

## DISCUSSION

On appeal, Plaintiff asserts that the ALJ: (1) improperly substituted her own lay medical judgments for those of the treating physician; and (2) improperly rejected Plaintiff's hearing testimony in evaluating her credibility.  (Doc. 8, pp. 11-16).  Defendant disputes these contentions with on the ALJ's first opinion rendered in June 2012, which is not the opinion at issue.  (Doc. 9, pp. 13-24).

### 1.    RFC Determination

Plaintiff asserts that the ALJ improperly substituted her own lay opinion in place of the opinion rendered by her treating physician, Dr. Menio, which resulted in an RFC determination not supported by substantial evidence.  (Doc. 8, pp. 11-15).

The responsibility for deciding a claimant's RFC rests with the administrative law judge.   See 20 C.F.R. § 404.1546.  The Court recognizes that the residual functional capacity assessment must be based on a consideration of all the evidence in the record, including the testimony of the claimant regarding her activities of daily living, medical records, lay evidence and evidence of pain. See Burnett v. Commissioner of Social Sec. Admin., 220 F.3d 112, 121-122 (3d Cir 2000).  The Commissioner's regulations define medical opinions as "statements

from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant's] symptoms, diagnosis and prognosis, what [a claimant] can still do despite impairments(s), and [a claimant's] physical or mental restrictions." 20 C.F.R. §404.1527(a)(2). Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

In arriving at the RFC, an administrative law judge should be mindful that the preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits. See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000). This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong

reason." Morales, 225 F.3d 316-18.  It is within the ALJ's authority to determine

which medical opinions he rejects and accepts, and the weight to be given to each

opinion.  20 C.F.R. § 416.927.  The ALJ is permitted to give great weight to a

medical expert's opinion if the assessment is well-supported by the medical

evidence of record.

Pursuant to Social Security Regulation 96-6p, an administrative law judge

may only assign less weight to a treating source opinion based on a non-treating,

non-examining medical opinion in "appropriate circumstances."  SSR 96-6p, 1996

SSR LEXIS 3.  This regulation does not define "appropriate circumstances," but

gives an example that "appropriate circumstances" exist when a non-treating, non-

examining source had a chance to review "a complete case record . . . which

provides more detailed and comprehensive information than what was available to

the individual's treating source."  Id. (emphasis added).

Regardless of what the weight an administrative law judge affords to

medical opinions, the administrative law judge has the duty to adequately explain

the evidence that he or she rejects or affords lesser weight.  Diaz v. Comm'r of

Soc. Sec., 577 F.3d 500, 505-06 (3d Cir. 2009).  "The ALJ's explanation must be

sufficient enough to permit the court to conduct a meaningful review."  Burnett v.

Comm'r of Soc. Sec., 220 F.3d 112, 119-20 (3d Cir. 2000).

Additionally, in choosing to reject the evaluation of a treating physician, an ALJ may not make speculative inferences from medical reports and may reject the treating physician's opinions outright only on the basis of contradictory medical evidence.  Morales, 225 F.3d at 316-18.  An ALJ may not reject a written medical opinion of a treating physician based on his or her own credibility judgments, speculation or lay opinion.  Id.  An ALJ may not disregard the medical opinion of a treating physician based solely on his or her own "amorphous impressions, gleaned from the record and from his evaluation of the [claimant]'s credibility." Id.  As one court has stated, "Judges, including administrative law judges of the Social Security Administration, must be careful not to succumb to the temptation to play doctor" because "lay intuitions about medical phenomena are often wrong."  Schmidt v. Sullivan, 914 F.2d 117, 118 (7th Cir 1990).

Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant.  See Doak v. Heckler, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested that the activity Doak could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence."); 20 C.F.R. § 404.1545(a).

As two commentators have explained:

> Sometimes administrative law judges assert that they - and not physicians - have the right to make residual functional capacity determinations. In fact, it can reasonably be asserted that the ALJ has the right to determine whether a claimant can engage in sedentary, light, medium, or heavy work. The ALJ should not assume that physicians know the Social Security Administration's definitions of those terms. <u>However, the underlying determination is a medical determination, i.e., that the claimant can lift five, 20, 50, or 100 pounds, and can stand for 30 minutes, two hours, six hours, or eight hours. That determination must be made by a doctor. Once the doctor has determined how long the claimant can sit, stand or walk, and how much weight the claimant can lift and carry, then the ALJ, with the aid of a vocational expert if necessary, can translate that medical determination into a residual functional capacity determination.</u> Of course, in such a situation a residual functional capacity determination is merely a mechanical determination, because the regulations clearly and explicitly define the various types of work that can be performed by claimants, based upon their physical capacities.

Carolyn A. Kubitschek & Jon C. Dubin, Social Security Disability Law and Procedure in Federal Courts, 287-88 (2011) (emphasis added). Therefore, the administrative law judge cannot speculate as to a claimant's residual functional capacity, but must have medical evidence, and generally a medical opinion regarding the functional capabilities of the claimant, supporting his or her determination. <u>Doak</u>, 790 F.2d at 29; <u>see</u> <u>Snyder v. Colvin</u>, 2017 U.S. Dist. LEXIS 41109 (M.D. Pa. March 22, 2017) (Brann, J.) ("I find that substantial

evidence does not support the ALJ's ultimate determination. The ALJ's decision to discredit, at least partially, every opinion of every medical doctor's RFC assessment of Snyder left the ALJ without a single medical opinion to rely upon in reaching a RFC determination. 'Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant.' Maellaro v. Colvin, Civ. No. 3:12-01560, 2014 U.S. Dist. LEXIS 84572, 2014 WL 2770717, at *11 (M.D. Pa. June 18, 2014)."); Washburn v. Colvin, 2016 U.S. Dist. LEXIS 144453 (M.D. Pa. October 19, 2016) (Conner, J.); Wright v. Colvin, 2016 U.S. Dist. LEXIS 14378, at *45-46 (M.D. Pa. Jan. 14, 2016) (Rambo, J.) ("Chandler stated that an ALJ need not obtain medical opinion evidence and was not bound by any treating source medical opinion. Id. However, both these statements are dicta. In Chandler, the ALJ had medical opinion evidence and there was no contrary treating source opinion. Id. '[D]ictum, unlike holding, does not have strength of a decision 'forged from actual experience by the hammer and anvil of litigation.' . . . the only precedential holding in Chandler is the unremarkable finding that an ALJ may rely on a state agency medical opinion that the claimant is not disabled when there are no medical opinions from treating sources that the claimant is disabled. See Chandler, 667 F.3d at 361-63. . . . Consequently, with regard to lay

reinterpretation of medical evidence, <u>Frankenfield</u>, <u>Doak</u>, <u>Ferguson</u>, <u>Kent</u>, <u>Van Horn</u>, <u>Kelly</u>, <u>Rossi</u>, <u>Fowler</u> and <u>Gober</u> continue to bind district Courts in the Third Circuit."); <u>Maellaro v. Colvin</u>, 2014 U.S. Dist. LEXIS 84572, at *32-34 (M.D. Pa. June 18, 2014) (Mariani, J.) ("The ALJ's decision to reject the opinions of Maellaro's treating physicians created a further issue; the ALJ was forced to reach a residual functional capacity determination without the benefit of any medical opinion.  Rarely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant. *See Doak v. Heckler*, 790 F.2d 26, 29 (3d Cir. 1986) ("No physician suggested that the activity [the claimant] could perform was consistent with the definition of light work set forth in the regulations, and therefore the ALJ's conclusion that he could is not supported by substantial evidence.").  *See also Arnold v. Colvin*, 3:12-CV-02417, 2014 U.S. Dist. LEXIS 31292, 2014 WL 940205, at *4 (M.D. Pa. Mar. 11, 2014); *Gormont v. Astrue*, 3:11-CV-02145, 2013 U.S. Dist. LEXIS 31765, 2013 WL 791455, at *7 (M.D. Pa. Mar. 4, 2013); *Troshak v. Astrue*, 4:11-CV-00872, 2012 U.S. Dist. LEXIS 137945, 2012 WL 4472024, at *7 (M.D. Pa. Sept. 26, 2012).  The ALJ's decision to discredit, at least partially, every residual functional capacity assessment proffered by medical experts left her without a single medical opinion to rely upon. For example, three

physicians opined that Maellaro was limited in some way in his ability to stand and/or walk: Dr. Dittman opined that Maellaro could stand/walk for less than one hour, Dr. Singh believed that Maellaro could stand/walk for fewer than two hours, and Dr. Dawson opined that Maellaro could not stand or walk for any length of time. Tr. 183, 211, 223. In rejecting these three opinions, there were no other medical opinions upon which the ALJ could base her decision that Maellaro essentially had no limitations in his ability to stand or walk.  Tr. 283. Consequently, the ALJ's decision to reject the opinions of Drs. Singh and Dawson, and the ALJ's determination of Maellaro's residual functional capacity, cannot be said to be supported by substantial evidence."); Gunder v. Astrue, Civil No. 11-300, slip op. at 44-46 (M.D. Pa. Feb. 15, 2012) (Conaboy, J.) ("Any argument from the Commissioner that his administrative law judges can set the residual function capacity in the absence of medical opinion or evidence must be rejected in light of Doak.  Furthermore, any statement in Chandler which conflicts (or arguably conflicts) with Doak is *dicta* and must be disregarded.  Government of Virgin Islands v. Mills, 634 F.3d 746, 750 (3d Cir. 2011)(a three member panel of the Court of Appeals cannot set aside or overrule a precedential opinion of a prior three member panel). "); Dutton v. Astrue, Civil No. 10-2594, slip op. at 37-39 (M.D. Pa. Jan. 31, 2012) (Munley, J.) (Doc. 14); Crayton v. Astrue, Civil No. 10-

1265, slip op. at 38-39 (M.D. Pa. Sept. 27, 2011) (Caputo, J.) (Doc. 17).

The Court's review of the administrative record reveals that the decision of the Commissioner is not supported by substantial evidence. The ALJ gave some weight to the opinion of PA Sharp, stating that "some of these restrictions are not particularly well defined and a physician's assistant is not an 'acceptable medical source.'" (Tr. 33). The ALJ entirely failed to assign weight to the opinion rendered by Dr. Menio in January 2012.[9] Defendant asserts that while the ALJ impermissibly failed to address this opinion, the ALJ's failure to do so was harmless error, and supports this assertion with evidence originating only from the ALJ's June 2012 determination, which is not the determination at issue. (Doc. 9, p. 19-20). It is well-established that, in reviewing an administrative law judge's decision, the District Court is permitted to analyze only those explanations that the administrative law judge actually provides for in his or her decision. Fargnoli v. Massanari, 247 F.3d 34, 44 n.7 (3d Cir. 2001) "In the absence of such an [explanation], the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." Burnett, 220 F.3d at 121. As such, this Court is not permitted to review these explanations provided by Defendant in support of

---

9. Regardless of its source, the ALJ is required to evaluate every medical opinion received. 20 C.F.R. §404.1527(c).

the ALJ's decision.

Moreover, regardless of whether the ALJ's failure to discuss Dr. Menio's opinion is harmless error, Defendant's assertion is a moot point because the ALJ still did not rely on any medical opinion in formulating Plaintiff's RFC, which violates the aforementioned Third Circuit precedent. Instead, the ALJ inserted her lay reinterpretation of the evidence in arriving at the RFC determination when in fact more restrictive limitations were opined by Plaintiff's treating physician, Dr. Menio. (Tr. 467-468). This Court cannot ascertain from the analysis conducted by the ALJ how she was able to determine a RFC which differed from the medical opinion of Dr. Menio regarding Plaintiff's limitations, particularly regarding limitations with sitting, walking, and standing.

Furthermore, the very definition of "sedentary work" found in 20 C.F.R. § 416.967(a) makes it all the more important that this case be remanded, for this regulation is as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. <u>Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties</u>. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a) (emphasis added). Social Security Regulation 96-6p

elaborates on the definition of sedentary work, stating, "'Occasionally' means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday.  Sitting would generally total about 6 hours of an 8-hour workday."  See SSR 96-6p, Policy Interpretation, Sedentary Work.  Dr. Menio's opinion limited Plaintiff to sitting for no more than three (3) hours in an eight-hour workday and to standing and/ or walking for no more than one (1) hour in an eight-hour workday, and noted that Plaintiff needed to be able to shift positions at will for sitting, standing, and walking.  (Tr. 467-468).  These limitations for sitting, standing, and walking were the only ones opined by a physician, were completely ignored by the ALJ in the determination at issue, and are not in accordance with the definition of sedentary work.  The fact that the ALJ did not give weight to any opinion involving walking, standing, or sitting, but rather instead reinterpreted the medical evidence in arriving at her RFC determination, goes to support the conclusion that the ALJ's RFC determination is not supported by substantial evidence.  See Snyder, 2017 U.S. Dist. LEXIS 41109 at *13-14 (Brann, J.) ("The ALJ failed to point to any specific medical evidence that would support a contrary opinion on Snyder's standing/walking capabilities, and as a result, it appears that the ALJ was forced to reach a RFC determination without the benefit of any medical opinion.  Accordingly, the ALJ's conclusion is

not supported by substantial evidence."). Therefore, pursuant to 42 U.S.C. § 405(g), remand is warranted.

This Court declines to address Plaintiff's remaining allegations of error, as remand may produce a different result on this claim, making discussion of them moot. Burns v. Colvin, 156 F. Supp. 3d 579, 598 (M.D. Pa. Jan. 13, 2016); see LaSalle v. Comm'r of Soc. Sec., Civ. No. 10-2011 U.S. Dist. LEXIS 40545, 1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## CONCLUSION

Based upon a thorough review of the evidence of record, it is determined that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, judgment will be entered in favor of Plaintiff and against Defendant, and the matter will be remanded to the Commissioner of the Social Security Administration.

A separate Order will be issued.


**Date**: October 13, 2017

**/s/ William J. Nealon**
**United States District Judge**